ANNIE E. ALEXANDER, BY HER NEXT FRIEND, v. WESTERN
UNION TELEGRAPH COMPANY.

(Filed 3 April, 1912.)

1. Telegraphs—Mental Anguish—Surgeon—Notice of Importance—
Substantial Damages.

　　For mental anguish proximately resulting from the negligence of a telegraph company in sending an affirmative reply from a surgeon to a message reading, "Young lady appendicitis; can't pay anything till fall. Will you operate? Answer," and signed by the physician of the patient, substantial damages are recov-

erable by the patient for whose benefit it was sent, the message giving notice of the character of damages that would likely result.

**2. Telegraphs—Reasonable Stipulations—Message—Blank.**

Telegraph companies may make reasonable stipulations restrictive of liability to the extent that they are not relieved thereby from the obligations of diligence superimposed by law in the performance of their duties.

**3. Same—Messenger—Agent of Sender—Principal and Agent—Telephone—Evidence.**

A telegraph company cannot avail itself of a stipulation in its message blank to the effect that a messenger boy is to be deemed the agent of the sender in taking a telegram to the telegraph office for transmission, without liability on the part of the company, when it appears that the sender of the message got into communication with a person answering the telephone number call of the company and the messenger came in accordance with a request that one be sent, and was evidently sent by the company for the express purpose of getting the message for transmission.

**4. Same—Prima Facie Agency.**

Testimony that the sender of a message called the well-known telephone number of a telegraph company's office and requested the one responding thereto that a messenger be sent to take a telegram to the office, and that the messenger appeared in consequence and received the message, affords evidence that the messenger was the duly authorized agent of the company for the purpose of receiving the message for transmission.

**5. Telegraphs—Mental Anguish—Surgeon—Measure of Damages—Evidence.**

In this case damages were demanded for mental anguish caused the plaintiff on account of the failure of the defendant telegraph company to transmit a telegram replying affirmatively to one sent to a surgeon by the plaintiff's physician, reading, "Young lady appendicitis; can't pay anything till fall. Will you operate? Answer." Evidence upon the measure of damages *held* competent which tended to show that the attending physician, not hearing from his telegram, did not call upon his patient until several hours after his usual time for a visit, desiring to make arrangements elsewhere; that in this interval of waiting the plaintiff, not understanding his absence, suffered mental anguish in apprehension that she could not get operated on, from which she supposed that she would die, etc.

6. Appeal and Error—Incompetent Evidence—Instructions—Harmless Error.

Instructions by the court in this case to the jury, that they must not consider certain incompetent evidence in an answer of a witness, on the question of the measure of damages for plaintiff's mental suffering alleged to have been caused by the negligence of defendant telegraph company in failing to transmit a message, *Held*, sufficient, and no error is found therein.

BROWN, J., dissenting.

APPEAL from *Cline, J.,* at December Term, 1911, of BEAUFORT.

Civil action to recover damages for negligent failure to deliver a telegraphic message. There was verdict for plaintiff establishing negligent failure to transmit message pursuant to contract, and awarding recovery of substantial damages by reason of mental anguish. Judgment on verdict, and defendant excepted and appealed.

*Ward & Grimes for plaintiff.*

*George H. Fearons, Small, MacLean & McMullan, and A. S. Bernard for defendant.*

HOKE, J. It was chiefly urged against the validity of this recovery:

1. That there was no evidence that the message had ever been received for transmission by defendant company.

2. That there was no sufficient evidence of mental anguish to justify an award of substantial damages on that account.

But we are of opinion that neither position can be sustained.

There was testimony on part of plaintiff tending to show that she resided with her mother about 300 or 400 yards from Swain, a local railroad station in a remote country district, and on 19 July, 1909, she became imminently ill with an attack of appendicitis. That her attending physician was of opinion that an operation was immediately necessary; that he was unwilling and unable to undertake it there with the facilities afforded, and that she should go to a hospital for that purpose. That the plaintiff and her people were unable to pay ready money for such operation, and the doctor, who lived in 150 yards of the

telegraph office, undertook to communicate by telegram with Dr. Leigh at Norfolk and ascertain if the patient could be received in the hospital there and given the necessary treatment. This was 2 P. M. Monday afternoon; that at 4 P. M. Dr. Speight sent Dr. Leigh at Norfolk a message of inquiry as follows:

DR. SOUTHGATE LEIGH,                    ROPER, N. C., 19 July, 1909.
        *Norfolk, Va.*

Young lady appendicitis; can't pay anything till fall. Will you operate? Answer.                                        J. H. SPEIGHT.

This message was shortly received at Norfolk, and within thirty minutes after receipt of same Dr. Leigh placed with a messenger boy, sent from defendant company's office for the purpose of taking the same, a return message, as follows:

DR. J. W. SPEIGHT.                                        July 19, 1909.
    Yes; send patient at once. What train?
                           SOUTHGATE LEIGH.

That this message was never received, and the doctor, not having heard, did not go to see the patient the following morning by 8:30, as he would have done, nor until 2 or 3 P. M., and then told the parties that no message had been received. That it was then arranged that the patient should go to Dr. Tayloe at Washington, N. C., and she did go there on Wednesday and was there treated successfully. That Dr. Tayloe was a skilled surgeon and the patient's case was properly treated at Washington. As tending to show a degree of mental suffering amounting to mental anguish, the plaintiff, testifying in her own behalf, among other things was allowed to say: "He said I had to go to the hospital right away. He could not operate on me. He said that he would wire Dr. Leigh that afternoon and let us know the next morning, and when my mother asked him why he did not come, he said it was because he had not heard from Dr. Leigh."

"Tell us whether you were alarmed or not about your condition, and to what extent, as best you can?"

(Objection by defendant; overruled, and defendant excepts.)

I was alarmed. I was scared. I had never thought of going

to the hospital before. My mother was crying and my sister, too, and of course they came in the room crying, and that scared me."

(Defendant objects to this form of answer and moves that the same be stricken out. Objection overruled, and defendant excepts. Here the court charged the jury that they should not consider the crying of the mother nor anything except the plaintiff's mental and physical condition directly due to her failure to hear from Dr. Speight as to whether he would operate.)

"I did not know of anywhere I could get relief except from Dr. Leigh during that whole day, until Dr. Speight came late in the evening and said he had not heard from Dr. Leigh, and fixed for me to go to the Washington Hospital."

Q. What impression was made on your mind by Dr. Speight —that you would die if you did not get operated on? A. He said that an operation had to be performed, and so I thought it was an operation or death.

Q. Why was it that you had to look to Dr. Leigh? A. Because that was all Dr. Speight had told me.

Q. Did you have any money to pay cash for your operation? A. I did not.

And again:

Q. From the time Dr. Speight said he could not hear from Dr. Leigh, on through the balance of the afternoon and night and next morning until you heard from Dr. Speight that Dr. Tayloe would operate on you, what was your mental condition with reference to the question as to whether you could get anybody to operate on you at all? A. I thought the reason that Dr. Leigh had not answered the telegram was that I did not have the money to pay him with, and I did not know whether I could get anybody else to operate on me or not. I did not know whether Dr. Tayloe would operate on me without the money or not, and my mind was all torn up because I did not know whether I could get anybody to operate on me or not. If I had heard from Dr. Leigh I would have known whether he would operate on me or not, and would not have been uneasy.

And further:

"I was conscious of everything that was happening. I was studying whether I could be operated on or not. I did not want to be operated on, but after Dr. Speight said I had to be operated on, I thought I would have to be operated on right away or die one. My mother and sister were crying because they were afraid of the operation and death, too, I suppose. What was troubling me was that Dr. Speight said I had to be operated on and we didn't hear from Dr. Leigh, and I didn't know of anywhere else I could get operated on." . . . "I did not know why he did not hear from Dr. Speight. I did not know whether he thought I would die before I could get to the hospital or not. I was lying there thinking that he thought I was too low to go to the hospital, and that I would die before I could get there. I thought he was waiting to let me die before he let us know what was the matter. That annoyed my mind."

Q. To what extent? A. I was in agony. I did not know what to do or what to think. I just thought he was waiting for me to die.

On the same subject Walker Alexander, a brother of plaintiff, testified as to his sister's suffering as follows: "She would ask me when I would go to the room, 'Bud, have you heard from the doctor yet?' and I said no. She said, 'Do you think I am going to die?' and I said, 'No, I hope not.' All she talked about was believing she was going to die."

The right of an addressee or a beneficiary whose interest has been made known to the company to recover for a negligent failure to deliver a message of this character is fully established with us, and a perusal of this testimony will clearly bring plaintiff's cause within the principle of our decisions where substantial damages by reason of mental anguish have been allowed. *Christmon v. Telegraph Co.,* present term; *Kivett v. Telegraph Co.,* 156 N. C., 296; *Suttle v. Telegraph Co.,* 148 N. C., 480; *Dayvis v. Telegraph Co.,* 139 N. C., 80; *Green v. Telegraph Co.,* 136 N. C., 489; *Bright v. Telegraph Co.,* 132 N. C., 317; *Kennon v. Telegraph Co.,* 126 N. C., 232; *Young v. Telegraph Co.,* 107 N. C., 370.

As to the receipt of the message by the company, the relevant facts appearing in the record as we understand them are, that the original message was received by Dr. Leigh in due course, at his office in Norfolk on the afternoon of 19 July, and the doctor then dictated a return message, which was written by his secretary on a company blank, kept regularly in his office for the purpose. The secretary then called over the telephone for 165, the telegraph company's number, and asked them to send a boy for the telegram. The witness stating that "165 was the defendant company's phone number, as she had called it several hundred times before. That in fifteen or twenty minutes, not over a half hour, a boy came for the return message, and it was delivered to him in the office of Dr. Leigh.

There was evidence for defendant from the different employees of the office that no such message was received in the office of the company, and the office record, the call sheet on which all entries of the kind were made, was referred to by the witnesses, who stated that it showed no call for a messenger on that date for any purpose, and on consideration of the testimony and the authorities applicable, we are of opinion and so hold, that there was a receipt of the return message for transmission on the part of the company, or rather testimony from which such receipt could be properly inferred, and this notwithstanding a stipulation appearing on the blank that no responsibility regarding messages should attach to the company unless accepted at one of its transmission offices, and if a message is sent to the office by one of the company's messengers, he acts for the purpose as "agent of the sender."

It is well understood here and in other jurisdictions that a telegraph company may make reasonable stipulations restrictive of its liability and to the extent that they are not relieved thereby from the obligations of diligence superimposed by law in the performance of their duties. *Sherrill v. Telegraph Co.*, 109 N. C., 527; *Thompson v. Telegraph Co.*, 107 N. C., 449. And there is authority to the effect that the stipulations in question here appearing on a blank on which the sender writes the message shall bind the sender as a part of the contract. *Stamey v. Western Union*, 92 Ga., 613. If this, however, may be

allowed to prevail under ordinary conditions, it is qualified, as a general proposition, by decisions which hold that if a messenger is instructed by the company to procure an answer, for this last purpose the messenger will be considered the company's agent and the stipulation referred to is not controlling. And this limitation should apply, we think, when in response to a specific request the company sends a messenger for the express purpose of taking a message. *Will v. Telegraph Co.,* App. Div. N. Y., vol. 3, 22; *Ayers v. Telegraph Co.,* App. Div., N. Y., 149; Jones on Telegraph and Telephone Companies, sec. 408; 37 Cyc., p. 1692, note 68.

The case of *Ayers v. Telegraph Co.,* 65 N. Y., *supra,* cited by defendant, recognizes the limitations on the general principle established in the former case. *Will v. Telegraph Co., supra.* In this connection it was further insisted for defendant that there was no evidence that the messenger boy was sent by the company for the purpose of receiving the message, and that the message given over the telephone wire to the telephone number of defendant company was not sufficient as testimony in the absence of evidence *ultra* that this message was received by an agent of defendant company authorized for that purpose, citing *Planters Oil Co. v. Telegraph Co.,* 126 Ga., 621. While there is some difference in the facts of that case, we do not think it can be upheld as authority on the facts presented here, where the number is called, known to be that of the telegraph company, "tried as such, several hundred times," as stated by the witness, and responded to by a company messenger. In such case, on the better reason and by the weight of authority, we are of opinion that a messenger sent in response to such a request should be considered *prima facie* an agent of the company, and certainly under such circumstance there is evidence from which authority of the company could be inferred. *Reed v. R. R.,* 72 Iowa, 166; *Rock Island R. R. v. Potter,* 36 Ill. App., 590; *Gore v. Tel. Co.,* Ct. Co. App., Tex., 124 S. W. R., 977; Jones on Evidence (2d Ed.), p. 262.

There were also several objections to the admission of evidence, chiefly as to the physical and nervous condition of the plaintiff at the time in question, but none of the exceptions can

be sustained or held for reversible error. Most of the testimony was directly relevant as tending to show mental suffering that would naturally arise under the conditions indicated, and where it was otherwise, the trial court in its clear and comprehensive charge was so careful to restrict the recovery and the effect of the evidence to the suffering directly attributable to the failure to deliver the message and to that alone that the jury could not have been misled. There is no error, and the judgment below must be affirmed.

No error.

BROWN, J., dissenting: The facts upon which this action is based are as follows: Plaintiff, who resided with her mother at Roper, N. C., was stricken with appendicitis. Her physician, Dr. Speight, advised an operation, and on Monday, 19 July, at 4 P. M., in plaintiff's behalf, wired Dr. Leigh at Norfolk, Va., in regard to performing it.

Dr. Speight told his patient that he would see her next morning, and let her know what Dr. Leigh said. Dr. Speight did not visit his patient next morning, as promised, but called to see her at 2 P. M. that day, Tuesday, and informed her that he had not heard from Dr. Leigh, and that he had arranged for her to go to the Washington (N. C.) Hospital to be treated by Dr. David Tayloe, an acknowledged expert in his profession.

Dr. Speight says that plaintiff could not have left her home and arrived at Norfolk until 4 P. M., Wednesday, the 21st, and that she arrived at Washington Hospital in safety at 11 A. M. that day, five hours earlier than she could have reached Norfolk. She would have been compelled to travel *eighty-four* miles to Norfolk, and only traveled *forty* to Washington.

Plaintiff admits "that she came to as good hospital as she would have gone to if she had gone to Dr. Leigh's, and got as good surgical attention."

Dr. Tayloe kept the plaintiff until 28 July, on account of slow development of the disease, before operating. The operation was successful, and plaintiff returned home completely recovered.

158—31

1. The defendant excepted because the court permitted testimony that the plaintiff traveled from Roper to Washington on a "mixed" freight and passenger train, and the record shows that this evidence was repeated to the jury in several different forms over the objection of the defendant.

It is true that his Honor, at the time when the objection was first made, stated to the jury that they were not to consider the riding on a freight train as a measure or cause of damage, and if the evidence had been terminated then and there under such instruction, it might be regarded as a harmless error.

But the record shows that this testimony was repeated by several witnesses after that admonition to the jury over the subsequent objection of the defendant, and strongly impressed upon them, and undoubtedly they had a right to suppose that such testimony as was allowed by the court, after the admonition given, was intended to be considered. Such evidence was utterly erroneous and very harmful.

The record shows that the plaintiff was brought in the baggage car on a cot. According to the testimony of Dr. Tayloe, himself, she need not have come on the "mixed" train, but could have taken the regular passenger train, and arrived at Washington at 4 P. M., the same hour at which she would have arrived at Norfolk.

Notwithstanding these facts proven by the plaintiff's own witnesses, and after the admonition of the judge, the plaintiff was permitted to testify that this "mixed" train, which she voluntarily took, without any necessity, was jarring in its motion, had to go in on side-tracks and get freight cars, log cars, and switch cars in and out.

No one can read the evidence in this case without being impressed with the undeniable fact that this evidence must have had great effect upon the jury in estimating the damages. That such evidence is incompetent, harmful to the defendant, and could not possibly have been in the contemplation of the parties, is shown by overwhelming authority. *Hancock v. Telegraph Co.,* 142 N. C., 163; *McCoy v. R. R.,* 142 N. C., 383.

I am of opinion that a new trial should be granted for this flagrant and material error. Other incompetent evidence was

received by the court over the 'objection of the defendant, on which it is not necessary now to comment.

2. I am of opinion that there is no evidence in this record upon which a legitimate claim for damages for mental anguish suffered by the plaintiff because she did not hear from Dr. Leigh can be founded. It is admitted by the counsel for the plaintiff that the only period of time when the plaintiff could have suffered any mental anguish on such account covered only a very short time. She was told by Dr. Speight that he could not hear from Dr. Leigh until some time Tuesday morning, when he would come over and inform her of the result. He did not come until 2 P. M. on Tuesday, at which time he informed her that he had not heard from Dr. Leigh, and had made arrangements to take her to Washington. She left for Washington the next morning, and arrived there at 11 A. M., and could not be operated upon until the 28th, on account of the condition of her appendix.

I fail to find in the testimony of the plaintiff herself anything whatever which tends to prove that from the time that she expected to hear from Dr. Leigh Tuesday morning until 2 P. M., when Dr. Speight came, she could reasonably have suffered any mental anguish because she had not heard from Dr. Leigh.

During that time, according to her own testimony, she had grown very weak from the acute and sudden attack of her disease; she was greatly under the influence of drugs given to deaden this pain, which according to all the evidence was of such acute character as to render the plaintiff practically oblivious to her surroundings, and to the fact that she had not heard from the telegram sent to Norfolk.

Again, his Honor permitted, over the objection of the defendant, not only the plaintiff herself, but her physicians to describe to the jury her physical condition, her acute and agonizing suffering, for none of which could this defendant be held responsible, and all of which was well calculated to appeal to the sympathies of any jury and greatly and grossly aggravated the damages assessed.

Upon the facts as set out in this record I am bound to conclude, with all deference to my brethren who differ with me,

that the plaintiff should be permitted to recover $1,000 for alleged mental anguish in not hearing from Dr. Leigh, when her body and mind were tortured by agonizing disease, which undoubtedly excluded every other thought, is a great miscarriage of justice which should not be permitted to take place in the courts of this State.

The majority of courts in this country, as well as Great Britain, repudiate this doctrine of "mental anguish" because of the inequalities it produces and the impossibility of establishing any uniform rule of damage, as well as on account of the frivolous character of many cases where the doctrine is applied.

I am of opinion that the facts of this case disclose no reasonable or just foundation upon which to base a recovery, and that it should be dismissed by the Court.