[Civ. No. 361.  Fourth Appellate District.—April 30, 1931.]

R. M. HELFEND et al., Appellants, v. CALIFORNIA
BANK (a Corporation), Respondent.

712.

Duke Stone and Hugh L. Dickson for Appellants.

Swanswick & Donnelly, W. I. Gilbert and R. W. Proudfit for Respondent.

JENNINGS, J.—From a judgment in favor of defendant plaintiffs prosecute this appeal.

During the year 1925, appellants were copartners engaged in the business of buying and selling ranch products and produce. In the month of October, 1925, appellant Helfend was in Roumania for the purpose of purchasing walnuts which it was proposed should be shipped to New York City and there sold at a profit. His copartner, Mosher, remained in New York City for the purpose of making profitable disposition of the nuts as they should arrive. On October 31, 1925, appellant Helfend had purchased and had ready for shipment 3,743 bags of walnuts, each bag weighing approximately 110 pounds. Not having sufficient funds to pay the export duty imposed by the Roumanian government on the entire shipment, he sent to his copartner Mosher the following cablegram:

"Bought 5000 bags comparatively very cheap as walnuts are sorted, bleached and graded. Only diamond style jumbos and number one Stop Send money telegraphically being otherwise exposed to sustain enormous losses Stop Have engaged space for thousand four hundred bags Abeline steamer Siana, leaving fourth November. Arriving in November New York Last Shipment completing entire lot leaving tenth November Stop I cannot leave before all merchandise.

"(Signed) HELFEND."

It appears to have been the plan of appellant Helfend to ship all of the nuts which he had purchased on a vessel

which was scheduled to leave the port where the cargo was collected ready for shipment on November 6, 1925. This would guarantee the arrival of the nuts in New York in ample time for the Christmas market. His copartner Mosher thereupon caused to be sent to his father C. L. Mosher the following telegram:

"November 1, 1925.

"C. L. Mosher,
    "307 South Virgil,
        "Los Angeles, Cal.

"Boys will be here November 20 need eight thousand dollars at once. Send money to Equitable Trust Company of New York to pay freight on 3600 bags walnuts coming over on passenger steamer Sinaia. They are all bleached, graded, only diamond style jumbos and number ones. All packed in new bags. Everything all O. K. Don't worry.
                                "(Signed)   WILL MOSHER."

On November 2, 1925, C. L. Mosher went to the California Branch Bank in Los Angeles, a branch bank of respondent, exhibited to the manager of the bank the telegram he had received, and paid to said manager the sum of $8,000 and a charge of $10 for transmitting the money to New York City. C. L. Mosher directed that the money be sent by telegraph and the manager of the bank agreed that he would so transmit it immediately. A written order for the transmission of the money was signed by the sender. This order is as follows:

"For value received California Bank agrees to forward by telegraph sum of Eight Thousand Dollars to be paid to Will M. Mosher upon identification. Street number 1416 Mermaid Ave., City and State, Coney Island, Country, New York, charges $8.00 debit account $1.20. This bank assumes no responsibility for delays or errors in the execution of this telegraphic transfer, after the message has been delivered to the telegraph company, nor for any errors, delays, claims or damages occasioned by the fault or neglect of its correspondents through whose hands it may pass.
                        "(Signed)   C. L. MOSHER,
                            "307 South Virgil Ave."

Thereupon and during the afternoon of November 2, 1925, a telegraphic order addressed to the Equitable Trust

Company in New York City was prepared. This order directed the Equitable Trust Company to pay to appellant Mosher in New York City the sum of $8,000 on proper identification. A buzzer by means of which messengers from the Western Union Telegraph Company were summoned to the bank was sounded and shortly thereafter an individual attired in the uniform of the Western Union Telegraph Company appeared at the bank. The message addressed in the Equitable Trust Company at New York City was delivered to him and he was paid in cash the charge for transmitting the message, amounting to $1.20. For some reason this message from the respondent bank to its correspondent in New York City was not delivered by the messenger to the telegraph company. Following an interchange of telegrams between appellant Mosher and his father, C. L. Mosher, and the bank, this fact was finally discovered and a message which accomplished the transmission of the funds to appellant Mosher was sent by the bank on November 10th, and received by the Equitable Trust Company in New York City on November 11, 1925. In the meantime appellant Helfend, lacking sufficient funds to pay the export duty on the entire shipment of walnuts, was unable to ship them on the boat which sailed from the Roumanian port on November 6th. He was able to pay the duty on 600 bags, which were accordingly shipped on this vessel. The shipment arrived in New York on December 5, 1925, and the walnuts therein contained were sold at a price of 16 cents per pound. The remainder of the shipment, consisting of 3,143 bags of walnuts, was sent on vessels leaving the Roumanian port on November 19th and November 28th. The nuts contained in these later shipments did not arrive in New York until after January 1, 1926. By the time the later shipments had arrived, the price of walnuts on the market in New York had dropped from 16 cents to about 5 cents per pound. The nuts contained in the later shipments were placed in storage and were finally sold at prices ranging from 10 cents to 12 cents per pound. Evidence introduced by appellants indicated that they expended about $52,600 on the enterprise and that they received a total amount of approximately $26,400. It would thus appear that appellants lost about $26,000 in the transaction.

■ It is the contention of appellants that the respondent bank is liable for the loss thus sustained, for it is argued that respondent was notified at the time the sum of $8,000 was turned over to it for transmission that this money was required for the payment of freight and duty, that the time element was vital, that the money should be transmitted immediately by telegraph, that nevertheless the money which it had received for immediate telegraphic transmission was not so transmitted, that delivery of the message which would have accomplished the transmission of the money to a messenger of the telegraph company was not delivery to the telegraph company, that the telegraph messenger was the agent of respondent until the message reached the telegraph company, that the negligence or dereliction of the telegraph company messenger is imputable to respondent. The very cornerstone of this line of reasoning is the proposition that the messenger of the telegraph company was the agent of respondent until the delivery of the message to the telegraph company. In support of this essential element, appellants point to the fact that on the blank forms provided by the telegraph company for the convenience of its patrons in sending messages is contained the following provision:

"No responsibility attaches to this company concerning messages until the same are accepted at one of its transmitting offices; and if a message is sent to such office by one of the company's messengers, he acts for that purpose as the agent of the sender."

Here then, it is said, is a clear declaration of nonresponsibility on the part of the telegraph company until the actual receipt of a message by it at its place of business and the statement that the messenger of the telegraph company acts as the agent of the sender until the telegraph company has actually received the message is a stipulation or condition by which respondent was bound when it elected to transmit the message through the medium of the messenger. It is also pointed out that the very language of the instrument by which respondent agreed to forward the money states that respondent assumes no responsibility for delays or errors in the execution of the telegraphic transfer, "after the message has been delivered to the telegraph company." It is urged that this amounts to a recognition by respondent

of responsibility for errors and delays until delivery of the message to the telegraph company. However, the declaration of the telegraph company that its messenger acts as the agent of the sender of a telegraphic message until the message has been received at the office of the company can hardly be said to be conclusive of the fact of agency in an action between the sender of the message and a third party. We are here concerned with the agreement between respondent and C. L. Mosher, and its liability to appellants will be determined by the provisions of this agreement and not by conditions purporting to limit its liability imposed by the telegraph company in its contract with the sender of a message. Nor do we regard as determinative the provision contained in respondent's agreement to · the effect that it assumes no liability for delays and errors occurring after the message has been delivered to the telegraph company. In a number of jurisdictions it has been held that where a messenger has been sent by a telegraph company to collect a message at the request of the sender, who paid to such messenger the charge for transmitting the message, the negligence of the messenger in failing promptly to deliver the message to the office of the telegraph company is imputable to the telegraph company notwithstanding there was printed on the reverse side of the blank form employed by the sender of the message a stipulation that the messenger should be the agent of the sender in carrying the message to the office of the telegraph company (*Baker* v. *Western Union Tel. Co.*, 221 Mo. App. 617 [287 S. W. 806]; *Alexander* v. *Western Union Tel. Co.*, 158 N. C. 473 [42 L. R. A. (N. S.) 407, 74 S. E. 449]; *Will* v. *Postal Tel. Cable Co.*, 3 App. Div. 22 [37 N. Y. Supp. 933]).

During the trial evidence was admitted which showed that the course pursued by respondent in summoning a telegraph messenger by means of a buzzer and delivering the message to such messenger was the course which was generally followed by banks in Los Angeles. Such evidence was properly admitted as showing the usual custom of banking business in the transmission of money by telegraph. (*Davis* v. *First Nat. Bank of Fresno*, 118 Cal. 600 [50 Pac. 666]; *Nicoletti* v. *Bank of Los Banos*, 190 Cal. 637 [27 A. L. R. 1479, 214 Pac. 51]). This evidence has an important bearing on the question of the

meaning of the phrase "delivery to the Telegraph Company", for if, as appears from the evidence introduced, it was the general custom of banks in the city of Los Angeles, in transmitting telegraphic messages, to pursue the identical course which was pursued by respondent in the instant case, it was then within the contemplation of the parties that respondent would perform its agreement to transmit the money in exactly the manner that it did and the delivery of the message to a messenger of the telegraph company summoned as herein indicated would, as between respondent and C. L. Mosher, amount to delivery of the message to the telegraph company.

On the question of the liability of respondent under the state of facts herein appearing the decision of the Supreme Court of California in the case of *Nicoletti* v. *Bank of Los Banos, supra,* is illuminating. In this case the appellant bank agreed to remit a sum of money to a certain named person at a designated place in Italy. The money was transmitted through a bank in New York City which was the correspondent of the appellant bank. The correspondent bank in turn transmitted the money through a bank in Milan, Italy. The last-named bank negligently delivered the money to a person other than the individual for whom it was intended. It was contended that the negligence of the Italian bank was imputable to the appellant bank. The Supreme Court, in reversing a judgment in favor of respondent, held that an agreement to remit or transmit money is an agreement to send and not an agreement to deliver and that there was an implied agreement that the money should be remitted through ordinary banking channels and that there is full compliance with such agreement when the original bank has exercised due care in the selection of the subagents to which the money is transmitted in the ordinary course of banking business. It is to be noted that the agreement of the respondent in the instant case was to "forward" the money. In *Katcher* v. *American Express Co.,* 94 N. J. L. 165 [109 Atl. 741], cited with approval in *Nicoletti* v. *Bank of Los Banos, supra,* the word "forward" used as a verb, was held to have a synonymous meaning with the word remit. So far, then, as respondent's agreement to forward the money is concerned, we have a situation analogous to that which

prevailed in the Nicoletti case. Indeed, the position of respondent herein is stronger than that of the appellant bank in the Nicoletti case, for here there is no dispute that the sender of the money contemplated and desired that it should be transmitted by telegraph and that he so advised respondent's manager. Surely, then, when respondent proceeded to carry out the sender's direction for transmission of the money, and in so doing pursued the course customarily followed by banks in forwarding money by telegraph, no liability attaches to it through the negligence or dereliction of the telegraph company's messenger who appeared in response to the automatic signal. It is urged by counsel for appellants that the Nicoletti case is not in point because it is said that in it the question involved was delivery of the money, whereas in the instant case there was an entire failure to transmit the funds. This is not strictly true. There was not an entire failure to transmit. Transmission was accomplished but was delayed for so long a time that loss resulted thereby. But this delay came about through the negligence or failure of the telegraph company's messenger. There is no dispute that respondent acted promptly and endeavored to set in motion the machinery for transmission during the very afternoon when it received the money. The vital principle of the Nicoletti case that a remitting bank is held to no greater liability than the exercise of due care in the selection of subagents to which money is transmitted in the ordinary course of banking business, is applicable. Furthermore, it does not satisfactorily appear from the record herein that respondent's manager was advised that the money which it was directed to transmit was required for the payment of duty in Roumania and the evidence shows that charges for freight and import duty imposed by the United States government were not required to be paid until the cargo arrived at New York and that the remittance, delayed though it was, arrived in ample time for the payment of such import duty and freight charges.

It is objected by appellants that the court's finding that the failure to ship the entire cargo of walnuts on November 6, 1925, was not due to lack of funds with which to pay freight, as the freight could have been paid after the arrival of the shipment at New York City, is not

supported by the evidence. In this contention, counsel is in error, for the testimony of appellant R. M. Helfend is clear that while the export duty required to be paid by the Roumanian government had to be paid before the shipment was permitted to leave that country, the freight charges were not required to be paid in advance. Appellants' further objection that certain of the court's findings are inconsistent is not sustained by the record.

The judgment is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 19, 1931.