[S. F. No. 9947. In Bank.—March 20, 1923.]

ASCANIO NICOLETTI, Respondent, v. BANK OF LOS BANOS (a Corporation), Appellant.

[1] BANKS AND BANKING — CONTRACTS — TRANSMISSION OF MONEY.— An agreement to "remit" or "transmit" money is an agreement to send and not an agreement to deliver.

[2] ID. — TRANSMISSION THROUGH ORDINARY CHANNELS — IMPLIED AGREEMENT—SELECTION OF AGENTS—NONLIABILITY.—An agreement by a bank to remit money implies an agreement to transmit the same through the ordinary banking channels and such agreement is fully complied with when the bank has exercised due care in the selection of the subagents to which the money is transmitted in the ordinary course of banking business.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. John J. Van Nostrand, Judge. Reversed.

The facts are stated in the opinion of the court.

Edward F. Treadwell and Forrest A. Cobb for Appellant.

Clay A. Pedrazzini for Respondent.

WILBUR, C. J.—The plaintiff alleges in his complaint that he delivered $550 to the defendant bank on February 15, 1915, whereupon the defendant "agreed, in writing, and for a valuable consideration, then and there paid, to

remit said money, duly exchanged in foreign currency, to plaintiff's mother, Rosa Nicoletti fu Innocenzo, then residing in Chiatri, Italy.'' It is alleged that the defendant did not remit said money or any part of it to the plaintiff's mother, Rosa Nicoletti fu Innocenza, then residing at Chiatri, Italy, and that the money had not been paid to her. The defendant by its answer admitted the receipt of the money and that plaintiff ''requested the said defendant to transmit five hundred and fifty dollars ($550) in gold coin of the United States, duly exchanged in foreign money, to Rosa Nicoletti, at Chiatri, Italy, and the said defendant then agreed to transmit the same in accordance with banking customs, and through ordinary banking channels for transmission of money to foreign countries, and the said plaintiff then and there delivered said sum of money to the defendant for that purpose,'' and alleges in detail the manner of the performance of its contract. It will be observed that the plaintiff alleged an agreement to ''remit'' the money and the defendant an agreement to ''transmit'' the money to Rosa Nicoletti at Chiatri, Italy. The difference between the allegations of the complaint and the admissions of the answer being in the allegation in the complaint that the words ''fu Innocenzo'' were added to the name Rosa Nicoletti, these words being omitted in the answer.

Upon the trial it was stipulated that on February 15, 1915, plaintiff delivered to the defendant $550 ''for transmission *through its ordinary banking channels to Chiatri, Italy;* that plaintiff herein claims that he instructed defendant herein to cause the same, or its equivalent, to be delivered to Rosa Nicoletti *fu Innocenzo,* who is his mother, at that place, and that defendant herein claims that he instructed it to deliver the said money, or its equivalent, to Rosa Nicoletti of Chiatri, Italy; that plaintiff's instructions to defendant, as aforesaid, are a matter in dispute and the right is expressly reserved to both parties to introduce evidence thereupon.'' (Italics ours.) It was also stipulated that San Filippo is a postoffice near Chiatri, Italy, and that there is no postoffice at the latter place; that there are three persons living in San Filippo named Rosa Nicoletti. Thus at least four persons named Rosa Nicoletti had their postoffice address at San Filippo. The bank in Milan, Italy, to which the money was transmitted by defendant mailed a

postal card to Rosa Nicoletti at Chiatri, Italy, by addressing it to Rosa Nicoletti *at San Filippo*, Italy. It was received by Rosa Nicoletti del fu Carlo Ridondelly, and upon her reply the Milan bank forwarded the money through the postoffice to the latter person, who received and receipted for and spent the same.

The trial court found that the plaintiff paid the defendant $550 in gold coin and that the defendant "then and there agreed in writing, and for a valuable consideration then and there paid, to remit said money duly exchanged in foreign currency, to Rosa Nicoletti, at Chiatri, Kingdom of Italy. That the said agreement is evidenced by a certain writing, delivered by defendant to plaintiff herein at the time of the said transaction, which writing is in words and figures following:

"(No. 106314—place and date, Los Banos, California, February 15, 1915.)

"Received of A. Nicoletti 550 dollars for payment of 2870 lire (foreign currency) to be *remitted* to Rosa Nicoletti in Chiatri, Italia.

"Signature
"P. J. DALY, Teller.

that the same is the only written evidence of the said agreement." (Italics ours.) Upon the controverted fact as to the person to whom the money was to be transmitted, it is thus found by the court that the agreement was to transmit the money to "Rosa Nicoletti, at Chiatri, Italy." It was also found by the court that the money was transmitted through the Mechanics' and Metals National Bank of New York City, which bank was the correspondent of the defendant and through which it customarily transmitted money to foreign countries and that such bank "was a proper channel through which to transmit the same in accordance with established banking practices." The court found that the Italian bank at Milan, Italy, was negligent in its delivery of the money to Rosa Nicoletti at San Filippo instead of at Chiatri and that the bank in Milan, Italy, "was the agent of defendant herein in the said transaction." Judgment followed for the amount claimed, and defendant appealed and filed a bill of exceptions specifying that the evidence was insufficient to justify the finding that the defendant agreed to remit the money to Rosa Nicoletti, "but, on the

contrary, the evidence shows that the said defendant agreed to transmit the same to the said Rosa Nicoletti *through its ordinary banking channels,"* and, second, that "the evidence is insufficient to justify the finding that the Societa Bancaria Italiana at Milan, Italy, was the agent of the defendant herein in the said transaction." (Italics ours.)

If there had been an express agreement to deliver the money to Rosa Nicoletti at Chiatri, Italy, there is no doubt that the plaintiff would be entitled to recover for the failure to do so. But the agreement alleged in the complaint, admitted in the answer, stipulated to by the parties and found by the court, was an agreement to *remit* the money to Rosa Nicoletti, at Chiatri, Italy. [1] An agreement to "remit" or "transmit" money is an agreement to send and not an agreement to deliver. The distinction is important because it fixes the status of the subagencies through which the money is to be transmitted and the consequent responsibility for the negligence of such subagencies.

The decisions upon the effect of a contract to remit money are few and recent, and the one most nearly in point is the case of *Katcher* v. *American Express Co.,* 94 N. J. L. 165 [109 Atl. 741], decided March 19, 1920. In that case the court of errors and appeals of New Jersey had under consideration a contract in the form of a receipt issued by the American Express Company, which states as follows: "Received," etc., "For remittance to Tese Kacjur. At Bereznier, Luckiy, Wolynck." In discussing the effect of such an agreement where the money had not been delivered, the court said:

"But, in view of the importance of the case as typical of a great number of similar transactions, we are not disposed to rest our decision on a mere question of pleading. The fundamental issue is as to the duty of the defendant under its contract. Plaintiff claims that defendant agreed to deliver the money, dollars or rubles, to Tese Kaczier at the place named. We are unable to read any such agreement from the written contract even as supplemented by parol evidence. It uses the word 'remittance' twice, and the word 'forward' (as a verb) once. Without doubt the two words are used synonymously. As we have said, the word 'deliver' is not used at all. The definitions of the word 'remit' in standard authorities do not involve the idea of delivery:

" 'Remit.   (2) To transmit or send, as money, bills, or other things in payment for goods received. [Quoting from Goldsmith]; I have received the money which was remitted here in order to release me from captivity.'   Century Dictionary.

" 'To transmit or send, especially to a distance, as money in payment of a demand, account, draft,' etc.   New International Dictionary.

"See, also, 24 Ency. Law (2d ed.) 461, and *Comber* v. *Leyland,* [1898] A. C. 530.

"So the word 'forward' is defined in both these authorities as:

" 'To send forward; to send toward the place of destination; to transmit.'

"See *Buell* v. *Chapin,* 99 Mass. 596 [97 Am. Dec. 58].

"The proper interpretation of the contract before us is this: That the express company was to convert the plaintiff's money, after deducting its own charges, by cable into rubles in Russia; that plaintiff had paid in sufficient to obtain these 1000 rubles after paying charges; that this sum of 1000 rubles was to be forwarded, or remitted, which amounts to the same thing, to Tese Kaczier at the given address by the usual course of the Russian mail.   This was the extent of appellant's primary duty under the contract. . . .''

The principle controlling the duty of a bank receiving commercial paper collection at a distant point would seem to be equally applicable to an agreement to transmit money to such a point.   We are not lacking an authority upon that question in California, although the decisions are not agreed upon that matter.

In the case of *Davis* v. *First Nat. Bank of Fresno,* 118 Cal. 600 [50 Pac. 666], this court, in dealing with the question of the liability of a bank which had taken a draft for collection, held that its duty was complete when it sent the draft through ordinary banking channels to another bank for collection, and this was true even though the plaintiff did not know that such was the custom of the bank.   In that regard the opinion states as follows:

"In making the collection the bank was acting as the agent of the plaintiff, and from the nature of the transaction was required to employ a subagent, and, as the agent

190 Cal.—41

of the plaintiff, was bound to exercise reasonable care and
diligence, as well in the employ of its subagent as in the dis-
charge of any other of the duties assumed by it. If in
making the collection it followed the course usually taken
by banks under similar circumstances it cannot be held to
have been negligent (*Dorchester Bank* v. *New England
Bank*, 1 Cush. (Mass.) 177; *Indig* v. *National City Bank*, 80
N. Y. 105)."

The decision of the supreme court of Massachusetts thus
cited by this court as authority for the decision (*Dorchester
Bank* v. *New England Bank*, 1 Cush. (Mass.) 117) con-
tains the following:

"The bills undoubtedly were intended to be transmitted
to Washington for collection, and if the defendants em-
ployed suitable subagents for that purpose, in good faith,
they are not liable for the neglect or default of the sub-
agents. This was so decided in *Fabens* v. *Mercantile Bank*,
23 Pick. (Mass.) 330. The chief justice, in delivering the
opinion of the court, says: 'It is well settled, that when a
note is deposited with a bank for collection, which is pay-
able at another place, the whole duty of the bank so receiv-
ing the note, in the first instance, is seasonably to transmit
the same to a suitable bank or other agent at the place of
payment. And as a part of the same doctrine, it is well
settled, that if the acceptor of a bill or promisor of a note
has his residence in another place, it shall be presumed to
have been intended and understood between the depositor
for collection and the bank, that it was to be transmitted
to the place of the residence of the promisor.' This
decision of the court on both points is, we think, well
founded in principle, and supported by a decided weight of
authority. . . .

"If the bank in that case acted in good faith, in selecting
a suitable subagent, where the bills were payable, there
seems to be no principle of justice, or public policy, by
which the bank should be made liable for the neglect or
misfeasance of the subagent. And it is admitted, by Mr.
Senator Verplanck, who states the grounds of the reversal
of the judgment, that the bank would not have been liable,
if there had been an understanding or agreement, express
or implied, that the bills were to be transmitted to another
bank for collection. · Now, we think, in that case, as in this,
there was manifestly such an understanding. There is an-

other view of that case, taken by the learned senator, in which we cannot concur. He makes no distinction between the neglect of the officers of the bank where the bills were deposited, and that of the bank to which they were transmitted for collection. We think the distinction is obvious. We agree, however, with the learned senator, that the decisive question in such cases is, what was the understanding of the parties, as to the duties the collecting bank undertook to perform. And as to this, we have no doubt of the understanding of the parties in the present case. That was, we think, that the defendants were to transmit the bills, or to cause them to be transmitted, to some suitable bank or other agent in Washington, for collection; and the questions are, whether, in employing the Commonwealth Bank to transmit the bills, the defendants acted in good faith; and if so, whether they are responsible for the failure of that bank. . . ."

This court in *Davis* v. *First Nat. Bank of Fresno, supra,* held that the usage of the bank to send its commercial paper to its correspondent banks for collection was binding upon the customer, even if he was ignorant of the usage and made no inquiries in reference thereto. In that regard the opinion states as follows:

"The court should also have permitted the defendant to show by the witnesses, which it called for that purpose, the usage of banks in regard to the collection of paper presented by persons who were unknown to them, and that the defendant conformed to that usage. (*Warren Bank* v. *Suffolk Bank,* 10 Cush. (Mass.) 582.) If such usage was reasonable and did not contravene any principles of law, the fact that the defendant followed it would tend to show that it exercised reasonable care in seeking to collect the draft. One who gives a draft to a bank to collect is held to have an implied knowledge of its usage in collecting drafts, so far as such usage does not contravene any rule of law. (Morse on Banking, sec. 9; *Bank of Washington* v. *Triplett,* 1 Pet. (U. S.) 25 [7 L. Ed. 37, see, also, Rose's U. S. Notes].) 'The fact that one deals with the bank without taking the trouble to inquire as to its system will raise the implication that he already knows and is satisfied with that system. It is clear that if a person hands over a note to a bank for collection, without any species of remark as to the course to

be pursued, the bank is not bound to thrust upon him a statement of its intended course and to retain him until the whole theory has been expounded to him, when his conduct unmistakably shows that either he already knows it, or else he does not desire to know it. Either he knows and approves it, or he voluntarily trusts to the wisdom of the bank at his own deliberately assumed risk of its sufficiency. In such a case the bank not only has a right to assume, but it is even positively bound to assume, that his desire is that the ordinary and established usage be pursued.' '' (See, also, *San Francisco Nat. Bank* v. *American Nat. Bank*, 5 Cal. App. 408 [190 Pac. 558].)

[2] It follows, then, that an agreement by a bank to remit money implies an agreement to transmit the same through the ordinary banking channels and that such agreement is fully complied with when the bank has exercised due care in the selection of the subagents to which the money is transmitted in the ordinary course of banking business.

The implied agreement between the parties was that plaintiff's money should be remitted by the defendant through the ordinary banking channels. It was stipulated that such was the actual agreement and the court found as a fact that the money was so transmitted.

The complaint, answer, stipulation of facts, and findings of fact, construed together, are to the effect that defendant's agreement was to remit through the ordinary banking channels. Such agreement would be implied from the written receipt given by the defendant to the plaintiff and set out in the findings.

In the findings of fact is a statement that the bank of Milan, Italy, was the agent of the defendant. In view of the fact that the court had already found the facts concerning the relationship between the plaintiff and the defendant and that it followed as a conclusion of law from such facts that the bank of Milan, Italy, was not the agent of the defendant, the statement in the findings that the bank at Milan, Italy, was the agent of the defendant is an erroneous conclusion of law which must be disregarded. The trial court also found that the bank at Milan, Italy, was negligent, but as we have already seen the defendant was not responsible for such negligence if it had exercised due

care in the selection of the subagents who were to transmit the money to the plaintiff's mother at Chiatri, Italy.

Judgment reversed.

Lennon, J., Myers, J., Tyler, J., *pro tem.*, and St. Sure, J., *pro tem.*, concurred.

LAWLOR, J., Dissenting.—I dissent.

There is a conflict in the authorities on the question whether the original bank is liable for the negligence of the subagents. *Exchange Nat. Bank of Pittsburgh* v. *Third Nat. Bank of New York,* 112 U. S. 276 [28 L. Ed. 722, 5 Sup. Ct. Rep. 141, see, also, Rose's U. S. Notes], was a case involving the collection of a draft in which it was held that the original bank was liable for the negligent act of the subagent. I quote: ''The bank is not merely appointed an attorney, authorized to select other agents to collect the paper. Its undertaking is to do the thing, and not merely to procure it to be done. In such case the bank is held to agree to answer for any default in the performance of its contract; and, whether the paper is to be collected in the place where the bank is situated, or at a distance, the contract is to use the proper means to collect the paper, and the bank, by employing subagents to perform a part of what it has contracted to do, becomes responsible to its customer. . . .

''Whether a draft is payable in the place where the bank receiving it for collection is situated, or in another place, the holder is aware that the collection must be made by a competent agent. In either case there is an implied contract of the bank that the proper measures shall be used to collect the draft, and a right, on the part of its owner, to presume that proper agents will be employed, he having no knowledge of the agents. There is, therefore, no reason for liability or exemption from liability in the one case which does not apply to the other. And, while the rule of law is thus general, the liability of the bank may be varied by consent, or the bank may refuse to undertake the collection. It may agree to receive the paper only for transmission to its correspondent, and thus make a different contract, and become responsible only for good faith and due discretion in the choice of an agent. If this is not done, or

there is no implied understanding to that effect, the same responsibility is assumed in the undertaking to collect foreign paper and in that to collect paper payable at home. On any other rule, no principal contractor would be liable for the default of his own agent, where from the nature of the business, it was evident he must employ subagents.''

The foregoing states the rule which prevails in New York, New Jersey, and some fourteen other states. (7 C. J. 606.) In Massachusetts and certain other jurisdictions the contrary has been held.

*Katcher* v. *American Express Co.,* 94 N. J. L. 165 [109 Atl. 741], relied on in the majority opinion, did not involve the liability of a forwarding bank for the negligence of its subagent. That action was brought to recover $194.50, the equivalent of 1,000 rubles, paid by plaintiff to the defendant express company for remittance to one Tese Kaczur in Russia. The money was not delivered and the question was whether plaintiff was entitled to his $194.50 or the value of the 1,000 rubles, the rate of exchange having meanwhile fallen. It was held by a divided court that by the terms of the contract the duty of the defendant was to send the money to the consignee by the usual course of the Russian mail and that delivery to the consignee was not agreed upon. An instruction was held proper wherein it was declared: ''If the defendant's Russian correspondent . . . purchased a money order for said 1,000 rubles at the Russian postoffice, inclosed the same in an envelope with postage prepaid, addressed to Tese Kaczur at the address given, this constituted a remittance of the money in the manner contemplated by the contract, whether or not Tese Kaczur ever received the money order.'' But it was not there held that if the Russian correspondent negligently misdirected the envelope containing the money order the contract would have been fulfilled and the defendant not be liable, which in principle is held in the prevailing opinion in the case at bar.

*Indig* v. *National City Bank,* 80 N. Y. 100, cited as authority in *Davis* v. *First Nat. Bank of Fresno,* 118 Cal. 600 [50 Pac. 666], is not authority on the question presented here. In that case the plaintiff in New York placed in the hands of the defendant bank for collection a note payable at the Bank of Lowville, of which the maker was a customer. Instead of sending the note to an agent for presentment, the

defendant bank sent it directly to the Bank of Lowville. The latter sent its draft in payment, but subsequently failed, which resulted in nonpayment of the draft. It was held there was no negligence on the part of the defendant bank in the method of collecting the draft, inasmuch as it followed the custom approved in such cases. There was no question of subagency involved, as the note was presented directly to the Bank of Lowville. This was clearly pointed out in *Briggs* v. *Central Nat. Bank of N. Y.,* 89 N. Y. 183 [42 Am. Rep. 285].

*Dorchester Bank* v. *New England Bank,* 1 Cush. (Mass.) 177, follows the Massachusetts rule.

In my opinion the rule laid down in *Exchange Nat. Bank of Pittsburgh* v. *Third Nat. Bank of New York, supra,* is more in consonance with justice and fair commercial dealing than the one followed in the majority opinion. It does not seem to me that the customer is afforded adequate protection unless the bank with which he dealt and in which he presumably had confidence should be responsible for the safe transmission of the money to the consignee. What the customer here undertook to bargain for was the payment of the money to his mother. Under the main opinion practically the only service rendered to him by the original bank was to select another bank to assume the responsibility. In this case the customer has lost his money and his only remedy is to proceed against the subagent or the party who actually received it. The prevailing opinion lays stress on the use of the terms "remit" and "transmit," but in view of the nature of the service to be performed the technical language employed should not be given a controlling effect. A much larger question is involved.

No hardship will result if in the absence of an express agreement the original bank is held liable, for transferring money is a part of its business and it can limit its liability by appropriate provisions in the contract. In the absence of such an agreement it is not fair to hold the public to a refined understanding of banking customs. *Davis* v. *First Nat. Bank of Fresno, supra,* and the later cases of *Gonyer* v. *Williams,* 168 Cal. 452 [143 Pac. 736], and *San Francisco Nat. Bank* v. *American Nat. Bank of Los Angeles,* 5 Cal. App. 408 [90 Pac. 558], to the extent they are at variance with the views herein expressed, should be disapproved.

Particularly is this true of the latter case, which holds that (syl.) "a reasonable custom of all the banks of a place that none of them shall be liable for commercial paper deposited with any one of them for collection elsewhere, until the proceeds thereof in actual money shall come to their possession, must be conclusively deemed known to the depositor and to be binding upon him as an implied condition of the contract of agency, without reference to his knowledge or want of knowledge of the custom." While evidence of the approved course of banking business might be relevant on the question whether a bank has been negligent, it should not be held that a group of banks could by agreement or custom alter their liability under the law of agency.

The judgment should be affirmed.

SEAWELL, J., Dissenting.—I dissent.

Under the facts as stated in the main opinion I am of the view that the defendant is liable for the failure of its subagent to carry out the trust which the initial bank accepted. There is a conflict of authority, as stated by Mr. Justice Lawlor, on the question of the liability of initial banks. The United States supreme court, New York, and a number of other states hold with the elementary principle of the law of contracts which is to the effect that the original principal may look to the original contractor with himself and is not obliged to look to inferior or distant under-contractors or subagents, when defaults occur injurious to his interests. (See Magee on Banks and Banking, 3d ed., 501.) This doctrine is known as the New York rule. California, by the three decisions cited, Massachusetts and other states, support the doctrine announced in the main opinion of this court, which is known as the Massachusetts rule. The California cases have to do with drafts sent from one bank to another for collection. So do practically all of the cases cited. The question here, in my judgment, involves a duty cast upon defendant to deliver money to a designated person in Italy. Certain words were stipulated into the case which brings it within the Massachusetts rule. I have no doubt but that the plaintiff understood that the defendant undertook to do the thing which he desired to have done, to wit, the delivery of $500 to his mother. There can be no doubt but that he felt secure in his transaction, otherwise he would not have

sought the services of a bank. He could and doubtless would have assumed the risk himself if he had known the bank furnished him practically no protection.

The word "remit" in its primary sense means to send in return, as money in payment of goods. Transmit is to send through or across; to act as a medium of passage. The word "remit" as applied to the facts of the case at bar is not an apt term. But fine shades of meaning should not be resorted to in a transaction such as this. Plaintiff's purpose was simple and easily understood. It is very evident that he delivered his money to defendant with a sense of assurance that the bank was responsible to him for the delivery of the money which he desired to send. This is a natural, common-sense view of a very simple transaction. There can be no doubt but that the business public generally, including a vast majority of those experienced in commercial transactions, hold the belief that when money is delivered to a bank to be sent by it to a person in a foreign country, as in this case, the initial bank accepts the trust with the understanding that should the money be lost or paid by a subagent to a person not entitled to receive it the initial bank is liable in the first instance to the principal. This is a reasonable rule and does not impute to the public a knowledge of the customs that may prevail in banking circles but which are actually unknown to the public. No hardship will fall to anyone. Banks accepting moneys to be sent abroad will doubtless charge a fee or carriage charge commensurate with the risk assumed, if this is not already the practice. Surely a person would much prefer to pay a reasonable charge for the privilege of enjoying the protection which the law of agency supposedly affords than to be left to the dubious remedy of proceeding against an agency not of his choosing. A departure from the doctrine laid down in the three California cases, if the rule there adopted extends to this case, will not unsettle business conditions nor disturb vested rights.

Inasmuch as the question involves in a measure our relations and dealings with foreign countries it would seem as a matter of policy and convenience that the several states should follow so far as possible the rule adopted by the supreme court of the United States.

The judgment of the trial court, in my opinion, should be affirmed.