[Civ. No. 4593.  Second Appellate District, Division Two.—June 8, 1927.]

FIRST NATIONAL BANK OF ELY (a Corporation), Respondent, v. W. N. HAMAKER et al., Appellants.

[1] Banks and Banking—Promissory Notes—Drafts—Notice of Dishonor—Time—Negligence—Judicial Notice.—In an action on a promissory note given to plaintiff bank to replace credit extended defendants on faith of a draft, which was dishonored by the drawee, a lapse of six weeks' time between the repudiation of the draft by the drawee and receipt of notice of dishonor by the bank did not constitute negligence, which, as a matter of law,

should be attributed to the bank and of which the court should take judicial notice.

[2] Id.—Evidence—Findings.—In such action, the evidence was sufficient to support the finding that plaintiff bank, on receiving notice that the draft and bill of lading attached, on which it had given conditional credit, had been repudiated, at once notified one of the defendants, who directed plaintiff to continue to hold the goods covered by the bill of lading until said defendant ordered them sold, and was not guilty of negligence.

[3] Id.—Ownership of Draft—Payment—Evidence.—In such action, the evidence was sufficient to show that the bank was only a collector and distributor of funds paid for the goods under an escrow agreement, and did not become the owner of the draft which was drawn to collect for such goods and which was accepted by the bank subject to immediate credit to defendants' account on condition that the draft be paid.

[4] Id.—Fraudulent Representations—Promissory Notes—Signatures—Evidence—Findings.—In such action, in which plaintiffs by cross-complaint set up that they were induced to sign the note by fraudulent misrepresentations of the manager of plaintiff bank that the account of one of the defendants was overdrawn, the evidence was sufficient to support a finding that such representation was not made and to justify judgment for plaintiff.

[5] Id.—Collection of Drafts—Negligence.—A forwarding bank is not responsible for the negligence of its correspondents in collecting drafts.

[6] Appeal—Failure to File Brief—Bad Faith—Costs—Penalty.— In this action on a promissory note, bad faith cannot be attributed to appellants for failing to file a brief in reply to that presented by respondent so as to justify a penalty for taking a frivolous appeal.

(1) 7 C. J., p. 623, n. 49.   (2) 7 C. J., p. 757, n. 53.   (4) 8 C. J., p. 1052, n. 50.   (5) 7 C. J., p. 607, n. 92.   (6) 15 C. J., p. 285, n. 44, p. 286, n. 69.

APPEAL from a judgment of the Superior Court of Los Angeles County. Ruben S. Schmidt, Judge. Affirmed.

The facts are stated in the opinion of the court.

5. Liability of collecting bank for negligence of correspondents and agents, note, 77 Am. St. Rep. 625. See, also, 4 Cal. Jur. 264; 3 R. C. L. 622.

Paul Barksdale D'Orr for Appellants.

Gibson, Dunn & Crutcher and Norman S. Sterry for Respondent.

MURPHEY, J., *pro tem.*—This is an action brought by the plaintiff against the defendants to recover on a promissory note in the sum of $3,500. The defendant Shephard being without the jurisdiction of the court was not served. Judgment was in favor of the plaintiff against the defendants Hamaker and Rea, who are the appellants herein. It is the contention of the appellants: (a) That the note was without consideration; (b) that it was procured by fraudulent misrepresentations; (c) that the findings are not supported by the evidence, and (d) that the judgment is against the evidence and against the law.

The circumstances under which the controversy arose were substantially as follows: The defendants were operating a tungsten mine near Ely, in the state of Nevada, under a conditional sales contract under which the defendants were let into the immediate possession and operation of the property. The contract provided that the vendors should place in escrow with the plaintiff bank a good and sufficient deed conveying the property to the defendants; that all shipments of ore were to be made in the name of the bank and of the funds derived therefrom a certain percentage was to be retained by the operators of the mine and the remainder to be delivered to the grantors under the conditional sales agreement. Three shipments had been made to Wile Electric Furnace Company, a Pittsburgh firm, prior to the shipment involved in this litigation. Shephard, the resident manager, had sold the tungsten concentrates to the Pittsburgh firm at prices agreed upon between them, seventy-five per cent of which selling price was to be paid on presentation of drafts attached to bills of lading, the balance after the receipt of the concentrates. In accordance with the escrow agreement a draft attached to a bill of lading was drawn in the name of the plaintiff bank for $4,450, being seventy-five per cent of the agreed purchase price of the fourth shipment. This draft was forwarded by plaintiff through its regular banking correspondents to a Pittsburgh bank for

collection.   At the time of forwarding the draft the amount
thereof was placed to the credit of Shephard's account in
the following manner, according to the testimony of one
Biggane, the manager of the Ely bank, who was the only
witness upon the subject: "The credit was made by pre-
paring a deposit slip for that amount, which I produce,
reading as follows: The First National Bank, deposit of
A. L. Shephard, Ely, Nevada, 4–24–1916.   Advance on fourth
shipment, $4,450.00—advanced on—   I ask leave to with-
draw that.   'Advance on fourth shipment, $4,450.00, to
Wile Electric Furnace Company, Pittsburgh, Pa., J. W.
Biggane.'   And at the foot of the deposit slip appears these
words, printed: 'All checks and drafts of this and other
banks credited subject to payment.' "   The market value of
the tungsten products was declining and when presented to
the drawee, payment was refused.   The date of this refusal
is fixed at about the twenty-eighth day of April, 1916, of
which fact the plaintiff bank was not notified until the
sixteenth day of June, when it received telegraphic advices
to that effect.   Shephard was immediately notified and upon
the return of the draft some days afterwards the Shephard
account was charged with the amount of the draft.   Under
these circumstances it is the contention of the appellants
that the correspondent banks were negligent; that the plain-
tiff was responsible for their negligence and that the plain-
tiff purchased the concentrates and the drafts; that the
draft belonged to the plaintiff and that it had no right
to charge the amount to Shephard.   Neither of these conten-
tions may be sustained, either by the facts as found by
the trial court nor by the law applicable thereto.   [1]   It is
manifestly the theory of the appellant that the time elapsing
from the repudiation of the draft by the drawee to the
time when the plaintiff bank received notice of dishonor, a
period of about six weeks, constituted negligence of which
the court should have taken judicial notice, which negligence
as a matter of law should be attributed to the plaintiff
bank.   If these acts or want of action constituted negli-
gence it was a matter of defense and it was incumbent
upon the defendants to show that under all the circum-
stances of the case negligence might be fairly predicated
thereon.   This they did not do.   There was not a word
of evidence that the correspondent banks were negligent

nor is there any evidence as to what their conduct and acts with respect to this transaction actually were. [2] So far as the activity of the plaintiff bank is concerned the court specifically found: "That upon receiving notice that the said draft had not been paid, the plaintiff at once notified said A. R. Shephard of said fact and that the said concentrates were being held by the plaintiff subject to the order of said A. R. Shephard. That said Shephard directed that the said plaintiff continue to hold said concentrates, and plaintiff complied with said direction and held said concentrates until said Shephard ordered them sold. That when said concentrates were finally disposed of by said Shephard, as aforesaid, the proceeds of the said sale were applied by A. R. Shephard upon a new and further indebtedness which defendants had incurred to the said plaintiff; that at the time the said note sued on was executed by the said defendants, W. N. Hamaker and George M. Rea, the account of said A. R. Shephard was not overdrawn. . . . " This finding is supported by the evidence of Biggane, who was manager of the Ely Bank during the time of the transactions involved in this litigation, and the only witness as to these matters. He said: "When we got notice that the draft on Wile Electric Furnace Company had been dishonored, I immediately notified Mr. Shephard, by letter or verbally, if he happened to be in town, I don't recall which way, but I remember absolutely that I gave him immediate notice." [3] With reference to the claim that the plaintiff bank was the owner of the draft and of the concentrates, this same witness testified in substance: "We had a conversation with Mr. Shephard when the first shipment of concentrates was offered to us under the escrow agreement. That was approximately in the month of March or April, 1916. This was about four weeks or so before the shipment to Wile Electric Furnace Company. We told him we would accept the drafts for credit, subject to final payment and receipt of the money in our hands, and without responsibility on the part of this bank or any correspondent bank or any channels through which it might pass for miscarriage through the mails or loss or in any other way. He assented to that. The other three shipments were made in precisely the same way as the Wile Company shipment. They had already been made. The custom of banks in

Ely and throughout the eastern part of the state of Nevada with reference to giving credit on drafts was to extend immediate credit, subject to final collection through the correspondent banks. If drafts, bills or checks on banks in other cities were not paid the custom was to charge them back to the customer." It is apparent from this testimony, and there is nothing to dispute or discredit it, that the bank was a collector and distributor of the funds under the escrow agreement. [4] There is some contention on the part of appellants that the Shephard account was overdrawn and so represented to them by the bank manager. There is no evidence to support this contention and the court specifically found such claim to be groundless. The finding in this regard being "That it is not true that on the 9th day of October, 1916, or at any time, J. W. Biggane represented to defendants W. N. Hamaker and George M. Rea, or either of them, that the account of A. R. Shephard was overdrawn, or make any representation to said defendants, or either of them, as to the account of their partner, A. R. Shephard, other than that there were checks drawn by A. R. Shephard on his account, aggregating approximately twenty-three hundred ($2,300.00) dollars in excess of the funds available in said account, and that said statements and representations by said J. W. Biggane were not false or fraudulent or for the purpose of deceiving the said defendants W. N. Hamaker and George M. Rea, or either of them, but were true." Neither of the appellants took the witness-stand nor did the defendant Shephard, although it appears by statement of counsel his deposition was taken and presumably he was available as a witness, certainly so to the extent of his deposition that had already been taken. No testimony was offered on behalf of the defendants to support the allegations of their cross-complaint that they had been induced to sign the promissory note by reason of fraudulent misrepresentations of the manager of the bank, but, on the contrary, the court found, as appears in the finding last above set out, that such statements as were made by the manager were true. The above analysis of the evidence would indicate that the judgment in favor of the plaintiff was proper, there being no showing of negligence of either the forwarding or correspondent banks. [5] However, in this state the law does

not make the forwarding bank responsible for the negligence of its correspondents.

In the case of *Nicoletti* v. *Bank of Los Banos*, 190 Cal. 637 [27 A. L. R. 1479, 214 Pac. 51], the court said: "The principle controlling the duty of a bank receiving commercial paper collection at a distant point would seem to be equally applicable to an agreement to transmit money to such a point. We are not lacking an authority upon that question in California, although the decisions are not agreed upon that matter. In the case of *Davis* v. *First National Bank of Fresno*, 118 Cal. 600 [50 Pac. 666], this court, in dealing with the question of the liability of a bank which had taken a draft for collection, held that its duty was complete when it sent the draft through ordinary banking channels to another bank for collection, and this was true even though the plaintiff did not know that such was the custom of the bank. In that regard the opinion states as follows: 'In making the collection the bank was acting as the agent of the plaintiff, and from the nature of the transaction was required to employ a subagent, and, as the agent of the plaintiff, was bound to exercise reasonable care and diligence, as well in the employ of its subagent as in the discharge of any other of the duties assumed by it. If in making the collection it followed the course usually taken by banks under similar circumstances it cannot be held to have been negligent. (*Dorchester Bank* v. *New England Bank*, 1 Cush. (Mass.) 177; *Indig* v. *National City Bank*, 80 N. Y. 105.)' The decision of the Supreme Court of Massachusetts thus cited by this court as authority for the decision (*Dorchester Bank* v. *New England Bank, supra*), contains the following: 'The bills undoubtedly were intended to be transmitted to Washington for collection, and if the defendants employed suitable subagents for that purpose, in good faith, they are not liable for the neglect or default of the subagents.' " The chief justice, in delivering the opinion in the case of *Fabens* v. *Mercantile Bank*, 23 Pick. (Mass.) 330, says: "It is well settled, that when a note is deposited with a bank for collection, which is payable at another place, the whole duty of the bank so receiving the note, in the first instance, is seasonably to transmit the same to a suitable bank or other agent at the place of payment. And as a part of the same doctrine, it is well

settled, that if the acceptor of a bill or promisor of a note has his residence in another place, it shall be presumed to have been intended and understood between the depositor for collection and the bank, that it was to be transmitted to the place of the residence of the promisor.'' The rule announced in these decisions is supported by a decided weight of authority. Many cases are cited sustaining this doctrine. It must be conceded that there is a conflict of authority as to the liability of a bank which accepts commercial paper payable at a distant point for collection. The New York rule being that the bank contracts to collect the paper and that its correspondents are its agents for whose negligence it is liable. However, courts adhering to the New York rule have always held that that rule may be modified or changed either by universal custom or by positive agreement. In *Allen* v. *Merchants' Bank of the City of New York*, 22 Wend. (N. Y.) 215–232 [34 Am. Dec. 289], the court, speaking through Justice Verplanck, said: ''The bank, if its officers think fit, and the dealer will consent, may vary that liability in either case. It may receive the paper only for transmission to its correspondents. That would form a new and different contract, and would limit the responsibility to good faith and due discretion in the choice of an agent.'' In *Exchange National Bank* v. *Third National Bank*, 112 U. S. 276–281 [28 L. Ed. 722, 5 Sup. Ct. Rep. 141], the court, in speaking of the rule announced by those courts which had accepted the New York doctrine, said: '' . . . The contract doctrine, that a bank, receiving a draft or bill of exchange in one state for collection in another state from a drawee residing there, is liable for neglect of duty occurring in its collection, whether arising from the default of its own officers or from that of its correspondent in the other state, or an agent employed by such correspondent, *in the absence of any express or implied contract varying such liability*, is established by decisions in New York.'' (Italics ours.) In the present case, the only witness called by the defense testified without contradiction: ''The custom of banks in Ely and throughout the eastern part of the state of Nevada with reference to giving credit on drafts was to extend immediate credit, subject to final collection through the correspondent banks. If drafts, bills or checks on banks

in other cities were not paid the custom was to charge them back to the customer. The original of the deposit slip, which has been put in evidence, stayed with the bank, but Mr. Shephard received a copy, in effect a duplicate original with the wording on it the same. All of our slips have this printed on them: 'All checks and drafts on this and other bank credited subject to payment.' That had been on all our deposit slips for years prior to this . . . it was the universal custom of banks to accept all drafts upon foreign connections as cash items with provisions. I mean by my expression 'with provisions' if the bank feels that the depositors are responsible customers, in many cases they extend immediate credit with the privilege of charging back in the event of nonpayment through any cause. With people who are not responsible, of course they do not do that." In this state in the case of *Davis* v. *First National Bank of Fresno, supra,* the court said: "The court should also have permitted the defendant to show by the witnesses, which it called for that purpose, the usage of banks in regard to the collection of paper presented by persons who were unknown to them, and that the defendant conformed to that usage. . . . 'The fact that one deals with the bank without taking the trouble to inquire as to its system will raise the implication that he already knows and is satisfied with that system. It is clear that if a person hands over a note to a bank for collection, without any species of remark as to the course to be pursued, the bank is not bound to thrust upon him a statement of its intended course and to retain him until the whole theory has been expounded to him, when his conduct unmistakably shows that either he already knows it, or else he does not desire to know it. Either he knows and approves it, or he voluntarily trusts to the wisdom of the bank at his own deliberately assumed risk of its sufficiency. In such a case the bank not only has the right to assume, but it is even positively bound to assume, that his desire is that the ordinary and established usage be pursued.' " To the same effect is the case of *San Francisco National Bank* v. *American National Bank of Los Angeles,* 5 Cal. App. 412 [90 Pac. 558].

[6] In this case the attorneys for appellant have filed no brief in reply to that presented by the respondent. Certainly, this was not because of the fact that the respondent's

brief failed in any respect to fully answer every point raised by the appellants in their opening brief.  It is earnestly contended on the part of respondent that the appellants should be penalized for having taken a frivolous appeal.  In this respect we do not feel that bad faith can be attributed to the appellants, although there seems to be very little merit in the appeal, either from the standpoint of the facts of the case or the law applicable thereto.  It is probably unfortunate that the respondent's very clear exposition of the law and facts of the case were not available to appellants before the appeal was initiated.

The judgment is affirmed.

Craig, J., and Thompson, J., concurred.