### In re LANART'S ESTATE.
No. 4182-A.

District Court of Alaska. First Division. Juneau.
July 15, 1939.

538

Frank H. Foster, of Juneau, for Red Cross.
Faulkner & Banfield, of Juneau, for claimant heirs.

ALEXANDER, District Judge.

This is an appeal from the court of the United States Commissioner (and ex-officio Probate Judge) for the Territory of Alaska, Juneau Commissioner's Precinct, in the above-entitled matter, from an order entitled "Order Setting Aside Purported Will Admitted to Probate and Decree Admitting the Claims of Erik Einar Krister Lof-

skog and Svanhild Sally Vilhelmina Abrahamson as sole heirs thereto," made by the judge of said court on February 9, 1938.

It appears from the proceedings had in the Commissioner's court that a petition for letters of administration was filed on December 31st, 1936, and pursuant thereto Guy McNaughton was duly appointed and qualified as administrator of said estate. That thereafter, on July 27, an instrument purporting to be the holographic will of the deceased was filed with petition for probate. Thereafter, on August 10, 1937, hearing was had for proof of the will, and on the same date an order entered admitting the document in question to probate as the last will and testament of the deceased and letters testamentary issued.

Thereafter a petition was filed on behalf of Erik Einar Krister Lofskog and Svanhild Sally Vilhelmina Abrahamson, attacking the validity of the document theretofore admitted to probate as the will of the deceased and claiming the estate of deceased as the brother and sister and only heirs of the deceased. Hearings were had thereon and on February 9, 1938, an order was entered setting aside the probate of the purported will and decreeing the claimants to be the rightful heirs of said estate.

From this decree appeal was taken by the American National Red Cross to this court.

The questions involved in this appeal are:

First: Whether or not the purported holographic or olographic will of deceased first admitted to probate by the Commissioner and ex-officio Probate Judge, and later set aside by him, is a valid will.

Second: Whether it is sufficient to bequeath the property of the deceased to the appellant American National Red Cross.

An "holographic will", as described and defined in Ruling Case Law, Vol. 28, under Section 16 of

"Wills", is: "One entirely written, dated and signed by the testator in his own handwriting."

Our law expressly recognizes holographic wills, and provides how they may be proven. Section 4624, C.L.A. 1933: *"Olographic wills; how proved.* Olographic wills, with or without attestation, shall be admitted to probate the same as other wills and be proved in the same manner as other private writings."

■ The document in question meets all the requirements of our law. The entire document is admittedly written, dated and signed wholly in the handwriting of the testator in conformity with our statute, and should be considered together as one document.

■ The uncontradicted testimony shows, and the court finds, that the purported will is "one entirely written, dated and signed by the testator in his own handwriting"; that the testator was at the time qualified under our law to make a will, being of sound mind, over twenty-one years old, and not acting under any fraud, duress or undue influence, and that said instrument was duly proved as provided by law as the last will and testament of Gustaf Lanart, deceased, and entitled to probate as such.

■ Having determined that the document in question is an holographic will and that the testator was qualified to make a will under our law, we pass to the discussion of the wording of the instrument and whether or not it is sufficient to dispose of the testator's estate. This, of course, will have to be determined by the general rules governing the construction of wills.

■ As has already been pointed out, "Aside from the requirement as to writing, date and signature, an holographic will is subject to no other form. It is sufficient if the writing expresses, however informally, a testamentary purpose in language sufficiently clear to be understood."

Ruling Case Law makes this statement of the law: "The cardinal rule of testamentary construction is to ascertain the intent of the testator and give it effect, unless the testator attempts to accomplish a purpose or to make a disposition contrary to some rule of law or public policy. All rules of construction are designed to ascertain and give effect to the intention of the testator and all rules or presumptions are subordinate to the intent of the testator where that has been ascertained. The intention will control any arbitrary rule, however ancient may be its origin, unless the testator attempts to effect that which the law forbids." 28 R.C.L. Sec. 173, pp. 213, 214.

And again: "The intent of the testator is to be collected from the whole will and from a consideration of all the provisions of the instrument taken together rather than from any particular form of words. The intention is not to be gathered from detached portions alone, and the court should not consider merely the particular clause of the will which is in dispute. The language employed in a single sentence is not to control as against the evident purpose and intent as shown by the whole will. In other words, a will is not to be construed per parcella but by the entirety. As sometimes expressed, the intent is. to be ascertained from a full view of everything within the four corners of the instrument. If the whole will clearly indicates what was the testator's intent the rules of law which aid in the construction of wills need not be invoked. 28 R.C.L. Sec. 175.

The policy of the law is to uphold wills and to make them valid and effective if that can be done. In doing so the courts have gone to great lengths and have repeatedly held that the intent of a testator need not be declared in express terms. Quoting again from Ruling Case Law, we find this statement: "The intent of the testator need not be declared in express terms in the will but it is sufficient if the intention can be clearly inferred from the particular provisions of the will and from its

general scope and import. The courts will seize upon the slightest indications of that intention which can be found in the will to determine the real objects and subjects of the testator's bounty. The clear intention of the testator should prevail although it would require some departure from the literal construction of one of the clauses in the will. The general pervading purpose of the testator may override any inconsistent specific provisions found in the will, and it has been held that the testator's particular intent, as shown by a single provision standing by itself, must yield to the general leading intent as manifested in the whole instrument. In the interpretation of a will the dominant or primary intention, gathered from the whole thereof and all its provisions, must be allowed to control, and a particular and minor intent is never permitted to frustrate a general and ulterior object of paramount consideration. Accordingly in interpreting wills favor will be accorded to those beneficiaries who appear to be the special objects of the testator's bounty." 28 R.C.L. Secs. 177–178.

"In the construction of wills the object is not to seek flaws and declare them invalid, but to assist them if legally possible, and the presumption is that the testator intended a lawful rather than an unlawful thing. Therefore where the language used in the will is reasonably susceptible of two different constructions, one of which will defeat, and the other sustain, the provisions, the doubt is to be resolved in favor of the construction which will give effect to the will rather than the one which will defeat it." 28 R.C.L. Sec. 167.

"The rules of construction are to be employed only when doubt exists and when a testator employs language that is clear, definite and incapable of any other meaning than that which is conveyed by the words used there is no reason for resorting to rules of construction." 28 R.C.L. Sec. 165.

An excellent collection and digest of the cases pertaining to the construction of holographic wills is found in a note following the case of Estate of Fay in 104 Am.St. Rep. at pages 22–34. In that note at page 24, under the heading, "What Writings Amount to" (Holographic Wills) it is stated, on authority cited: "It is sufficient that he (the testator) manifests his wish that, on his death, his property, or some part of it, shall go to another person by him designated."

Holographic wills being made by the testator himself without the aid of experienced or professional help should, from their very nature, be more liberally construed than ones prepared by practical hands. If it were otherwise, few, if any, holographic wills would ever be sustained. Furthermore, our statutes not only recognize them but apparently favor them, and there is ample reason why this is so. This is a large territory, approximately one-third the size of the United States proper; sparsely settled by small settlements and with great distances between them. The major part of our population is made up of miners and fishermen living and working in remote places, alone or in small groups, often under the most rigorous climatic conditions and having only the most primitive means of transportation. The action of our Legislature in this regard is therefore not only logical but reflective of the actual necessities of our conditions, for probably nowhere else in the world do conditions so necessitate the aid of both the courts and the Legislature in making it possible for its citizens to make testamentary disposition of their property in the simplest manner.

That it was intended by him to be his last will and testament is also borne out by the wording of the document itself. It begins by stating that "After death" (showing it to have been made in contemplation of death) "forward all to Red Cross"; and in another place he calls it his "will." The testator then gives his reason for making the Red Cross the recipient of his bounty, viz., "As I

don't think relatives are alive and the (they) might be able to do some good with the little I have."

Some question has been raised by counsel on both sides as to the wording of the instrument, claiming that some of it is illegible. I do not, however, agree. If the instrument is put under a strong reading glass and examined (as I have done) I think it can be read in its entirety without difficulty.

Counsel for the claimant heirs contends that the document under consideration is not a will "for the testator does not give, devise nor bequeath anything to anybody; he does not use any words or language in the document which have that meaning."

 There is no merit in this contention. It is not necessary that any testamentary or other technical words be employed. Ruling Case Law, Vol. 28, Sec. 116, states the law thus: "Aside from the requirement as to writing, date and signature an holographic will is subject to no other form. It is sufficient if the writing expresses, however informally, a testamentary purpose in language sufficiently clear to be understood."

Our statute also provides (Sec. 4639, C.L.A.1933): *"Construction of wills; testator's intention to be carried out.* All courts and others concerned in the execution of last wills shall have due regard to the directions of the will and the true intent and meaning of the testator in all matters brought before them."

Counsel for the claimant heirs also takes exception to the word "forward" used in the will, and it is contended that the testator not only failed to use any of the legal testamentary terms but does not even say that he "gives."

As already pointed out holographic wills are not required to be in any particular form, but any language used expressing the intentions of the testator is sufficient.

"Forward", according to the authorities, means to send forward—to send toward place of destination; to trans-

mit. ˙ Webster's Dictionary; 17 Words and Phrases, Perm. Ed. p. 446; Nicoletti v. Bank of Los Banos, 190 Cal. 637, 214 P. 51, 52, 27 A.L.R. 1479.

It also means or implies to send or transmit the identical thing—that which is delivered for that purpose; and "forward" has been held to mean, as applied to a package of currency delivered to an express company for that purpose, "that the company should carry and deliver the package to its destination. 17 Words and Phrases, Perm. Ed. p. 446; Reed v. United States Express Co., 48 N.Y. 462, 8 Am.Rep. 561.

▇▇▇▇ Furthermore, the wording of the will should be read in the light of the circumstances surrounding the testator at the time, as disclosed by the evidence in the case.

The testator was an ignorant, illiterate man. His entire estate consisted of cash (money in bank) and stocks or bonds. There was no real estate to be sold nor even personalty that needed to be converted into cash. Everything that he owned could be simply gathered up and "forwarded" in its then condition, without further trouble, and he apparently had the idea, as many people do, that nothing more was necessary to effectuate his intention of bestowing his estate upon the object of his bounty, the Red Cross, or American National Red Cross. That, in any event, is the view of this court, and one of the conclusions upon which we have determined the real intention of the testator.

The other pertinent facts appear to be substantially as follows:

The deceased, Gustaf Lanart, whose true name, according to his declaration of intention to become a citizen of the United States, was Gustaf Lanart Lafskog, was born on March 15, 1873, at Alghult, Sweden, and according to the same authority he arrived at Philadelphia about April 13, 1906. He later came to Alaska where he has lived since about April 1, 1912, and became a naturalized

citizen of the United States at Juneau, Alaska, on December 16, 1918.

On or about December 10, 1936, the body of Gustaf Lanart was found at or near his cabin, at Cambier Bay, Alaska. For many years Lanart had lived and been employed as a watchman by the Pacific American Fisheries at its cannery there and had lived on a wanigan at or near the cannery. The cannery had been closed for many years, and since then Lanart had led a solitary and lonely existence as a watchman there, relieved only by visits from chance passers-by and occasional trips to Juneau for supplies, or on business. About December 1, 1936, Lanart made a trip to Juneau (about a hundred miles from Cambier Bay) during which trip he deposited or left with the B. M. Behrends Bank there a tin box for safe-keeping. This box was later found to contain bank books, stock certificates, etc., showing him to be the possessor of an estate of about $8,000 in money and stocks.

Following the finding of Lanart's dead body the United States Commissioner at Juneau was notified, and accompanied by Messrs. Guy McNaughton and M. E. Monagle, the Commissioner proceeded to that place, and while there was given the little book in which was written what is now claimed to be the holographic will of Gustaf Lanart, now in question.

The will had been found in a small black grip floating in the water in Lanart's cabin on the wanigan which had sunk, and contained, besides the will in question, receipts and other valuable papers belonging to the deceased.

It also appears from the testimony and record in this case that the deceased led a lonely and desolate existence far removed from any of his relatives, including the claimants, and that he had not even heard from them for so many years that he states in the disputed document, "I don't think any relatives are alive."

All of the witnesses agree that he was, or appeared to be, a man past sixty years of age, and the fact that he

made this purported will commencing with the words "After death" is at least presumptive proof, of the fact, that at his age and in his condition he contemplated death and intended to dispose of his property. No better proof of his lack of education and general ignorance of the prerequisites of disposing of his estate in a legal and orderly manner is necessary than the instrument itself. From it we gather the general conclusion that it was written in contemplation of death and that he thereby intended to dispose of his estate. Wishing to do some good with what he had, and having no particular friends to whom he cared to leave his estate, and believing as he apparently did and as he states in the instrument, that he had no relatives living, and apparently casting about for a beneficiary upon whom to bestow what estate he had, that would do some good with it, he must have thought of the Red Cross as an agency or organization that did a lot of good in the world, and he therefore designated it as the object of his bounty. This too is borne out by the language of the instrument itself, in which he recites, "Please forward all to Red Cross * * * The (they) might be able to do some good with the little I have." Twice in the instrument the word "the" is used instead of "they" which he undoubtedly intended.

Lanart probably was ignorant of the legal name of the Red Cross, but knew it as thousands of others know it, by the name "Red Cross" and not "American National Red Cross," its real name. However, such a lack of knowledge as to the legal name of the Red Cross should not affect the validity of his will. The Red Cross is known throughout the world as a charitable organization, and there is only one Red Cross in this country that has the legal capacity to accept such a bequest and that is the American National Red Cross. It is the only Red Cross that deceased could have had in mind and the only one that he could have intended to make his beneficiary.

To contend, as do the claimant heirs, that he might have just as well meant the Canadian Red Cross or the Swedish Red Cross, is to our mind, wholly without merit. The testator had never even been in Canada, so far as anyone knows, and he had been away from Sweden for more than thirty years; had no relatives living there as he apparently believed, from the wording of his will, and had long since severed all ties with that country. He had lived in America for thirty years and had become an American citizen nearly twenty years before his death, and it stands to reason that the only Red Cross he could have had in mind was the American Red Cross or the American National Red Cross, that being the only American organization known as "Red Cross" capable of accepting his bounty, and it is inconceivable that he could have had any other Red Cross in mind.

Furthermore the apparent intent of the testator was to make a charitable gift or bequest to the Red Cross, and charitable gifts and bequests have always been favored by the law.

"The doctrine early became crystalized as a part of the common law of England that gifts to charitable uses should be highly favored and construed by the most liberal judicial rules, rather than that the gifts should fail and the intent of the donor fail of accomplishment. Charitable bequests are therefore liberally construed to carry into effect the intention of the testator and every presumption consistent with the language used will be indulged to assist." 28 R.C.L. Sec. 172.

The case most nearly in point that has been called to my attention or that I have been able to find is American Bible Society et al. v. American Colonization Society et al., decided by the Supreme Court of New York, 50 Hun 194, 2 N.Y.S. 774, 775.

This was an action to construe the will of Sarah Bunce, deceased. The court below entered judgment denying the American Colonization Society the right to recover a por-

tion of the estate of testatrix, and that society appealed. The facts requisite to an understanding of the case are as follows:

Sarah Bunce died in 1831 leaving a will dated July 16, 1833, and a codicil thereto dated October, 1839. The material part of the codicil on which the question in this case arises is as follows: "Sixthly: I give to my beloved niece Sarah B. Munsell and her husband Harry H. Munsell, for their joint lives my house and lot number 18 10th Street. On their death I direct the same to be sold by my trustee or any person to be appointed by the proper tribunal, of the State of New York, and the proceeds divided evenly among the following societies, to-wit: The American Bible Society, The American Tract Society, the New York Seamens' Friends Society and the American Colonization Society, all of or in the City of New York."

Macomber J. in delivering the opinion of the court said (inter alia):

"The right of the appellant the American Colonization Society to the remaining one-fourth is contested by the other defendants, who are the next of kin of the testatrix, upon the ground that the appellant is not the beneficiary designated by the codicil.

"The American Colonization Society existed as an unincorporated institution from about the year 1816 to the year 1831, when, by an act passed at that time, and by an amendatory act of 1837, it was incorporated by the legislature of the state of Maryland. It has always been known as a national organization, having auxiliaries in nearly all, if not all, of the states of the Union, with head-quarters at Washington, D. C. It never has been known by any other name than the American Colonization Society.

"There is no dispute or question made in regard to the identity of this particular corporation which asks for this portion of the estate of the deceased. Its identity is as distinctly established as that of either of the counsel in this

case. Why, then, the question arises, did the trial court refuse to award a portion of the decedent's estate to it?

"If its judgment can be maintained at all, it must be upon the statement of the learned judge at the special term, who says: 'It is quite obvious that the testatrix intended that the bequest should not be to the appellant the American Colonization Society, but to the society which was organized in the state of New York as an auxiliary society.' There was a New York State Colonization Society, which existed as an unincorporated institution long before, and for six years after, the execution of the codicil of the testatrix, and which was finally organized under that name by an act of the legislature of New York (Laws of 1855, p. 376).

"The last-named society was, of course, at the time of the writing of the codicil, incapable of taking the legacy, because it was not incorporated, and consequently had no legal existence. Nor was it incorporated afterwards until after the death of the testatrix. * * *

"No argument is presented by the respondents denying the appellant's ability to take and hold bequests, but the contention in their behalf is simply that it is not the party designated in the will. It is to be observed that the expression 'all of or in the city of New York' is in no sense a part of the name of either of the corporations named in the instrument. Had the codicil said 'the American Colonization Society of the city of New York' some reasonable ground would be offered for the position taken by counsel for the next of kin of the testatrix.

"Generally the designation of a corporation as being of a certain place constitutes a part of its legal name for the transaction of business, but in this instance there is no designation of the American Colonization Society as being of the city of New York. The expression used 'all of or in the city of New York' is in the alternative, meaning a corporation either existing by law, with head-quarters at the city of New York, or, having its head-quarters else-

where, with a place of business in the city of New York, conducted by its agents or otherwise. But was not the appellant in every material sense in the city of New York, within the meaning of the term which was evidently in the mind of the testatrix?

"It was established by the evidence without dispute that the New York Colonization Society, both before and after incorporation, was a mere hand or means to enable the parent society, the American Colonization Society, to carry on its business, which was the colonization of free colored persons upon the coast of Africa.

"It was shown that the agents of the American Colonization Society organized the local society of the State of New York. Nearly all of the expeditions carrying emigrants to Liberia sailed from the port of New York. All of the moneys collected by the New York Colonization Society were forwarded to the American Colonization Society at Washington, and expended by that corporation, and none of them were disbursed by the local or auxiliary society in the city of New York. Such, also, was the practice in other, if not all, of the states of the Union.

"As the chief witness in the case says, the state organizations, whether incorporated or otherwise, were but the hand or agent by which the parent society conducted its work. Each of the state societies had representation under the rules established by the American Colonization Society, fixed at the rate of one delegate to the annual conventions for every sum of $500 subscribed in the particular state. * * * Hence it is that, if the parent society were obliged to show that it was in a literal sense in the city of New York, we think the evidence was sufficient to warrant the testatrix's use of that expression as a matter of description of the object of her bounty.

"But it is not necessary to put our decision upon that ground. It is sufficient that the appellant appears as the accurately-described person named in the will, and is capable of taking the bequest, and that there is in point

of fact no question arising as to whom the testatrix intended to designate as her legatee. Any different conclusion would be to assume that the testatrix did not mean what she wrote and to impart into the codicil an intention which is not only foreign to its entire scope and particular purpose, but which even does violence to its plain reading, and this, too, for the purpose not of upholding, but of defeating, the legacy.

"This is not construing, but destroying, the will. Indeed, so definite is the person of the legatee, and so perspicuous and unmistakable the gift, that the case is hardly one which requires the court to construe the instrument in the ordinary meaning of the phrase.

"The error of the learned judge at the trial seems to be that the intended beneficiary was one which must have a legal residence in the city of New York; but in cases of mere misdescription of residence alone the legacies do not fail where the person intended is definite and certain. Lefevre v. Lefevre, 59 N.Y. 434; St. Luke's Home [for Indigent Christian Females] v. Association [for Relief of Respectable Aged Indigent Females in City of New York], 52 N.Y. 191 [11 Am.Rep. 697]. To this extent the judgment should be reversed, and the judgment modified so as to permit the appellant to take its share of the estate."

We consider this case directly in point. The gift or bequest in this case is made to the "Red Cross." The only Red Cross capable of accepting the bequest is the American National Red Cross, a national organization having local branches in every state and in every hamlet of any size in the United States. It is generally known simply as the "Red Cross" and very few people know it by its true name. As stated by Judge Macomber, "Its identity is as distinctly established as that of either of the counsel in this case." Like the American Colonization Society, it has always been known as a national organization with headquarters in the City of Washington and auxiliaries or

local societies throughout the nation. Like the American Colonization Society all monies collected by its auxiliaries or branches are forwarded to the parent organization, the American National Red Cross, at Washington, and disbursed by that corporation through its local or auxiliary societies or branches throughout the states of the Union. Like it, again, the state and local organizations of The American National Red Cross are but the hand or agent by which the parent society conducts its work, and the real beneficiary (the American National Red Cross) is as accurately described by calling it the "Red Cross," if not in fact infinitely better described, than it would have been had it been described by its legal designation.

It is hardly to be expected that the ordinary individual, particularly one of the limited education of Gustaf Lanart, would be as careful in describing his beneficiary as was Charles Carroll in describing himself when he signed the Declaration of Independence, and identifying himself as "Charles Carroll of Carrollton."

In point also is the case of State of South Dakota, appellant, v. American National Red Cross, reported in 60 S.D. 608, 245 N.W. 399, decided November 28, 1932.

In that case the testator, Theodore Engles made his last will and testament containing the following provision: "Fourth. The balance of my property both real and personal, I give and bequeath to Red Cross Society."

It is contended by the American National Red Cross that the real estate passes to it under the fourth paragraph or residuary part of said will. The State of South Dakota contends that said real estate passes to it (the State) for want of legal heirs. Five propositions were presented for consideration in the trial court, among which were:

"Three. Is the language designating the residuary devisee, to-wit, Red Cross Society, sufficiently definite to identify the American National Red Cross?

"Four. Can the American National Red Cross receive bequests and devises under its charter?

"Fifth. Can the American National Red Cross receive bequests and devises by way of charitable use or trusts?"

In addition to the American National Red Cross of Washington, D. C., filing its petition in intervention, the Wakonda branch of the Clay County Chapter of the American National Red Cross claimed that it was entitled to all of the residue under the quoted provisions of said will.

The Circuit Court found in favor of the intervenors, the American National Red Cross of Washington, D. C., to the effect that it was entitled to the property in controversy, and from that decision appeal was taken.

Warren, J., in delivering the opinion of the court, states:

"Appellant urges the failure of testator to specifically name and identify the beneficiary in the residuary clause, in that he used the term 'Red Cross Society'; that the designation is so uncertain that it may mean the American National Red Cross of Washington, D. C., or it may mean the local chapter of the Red Cross, of which he was a member, and that it is therefore most likely that he wished to bestow the gift upon the local organization. Appellant further urges that the language is insufficient to pass the real property to the 'Red Cross Society' in that the testator used only the words 'give and bequeath' and failed to use the usual term 'devise.' An investigation of authorities as to what particular society testator had in mind seems to indicate that the words 'Red Cross Society' mean the national organization. See American National Red Cross v. Felzner Post, 1928, 86 Ind.App. 709, 159 N.E. 771. The belief is strengthened by the wording of the congressional act or charter creating the American National Red Cross (36 U.S.C.A. § 1 et seq.). 36 U.S. C.A. Sec. 4 of said act of Congress being as follows: 'It shall be unlawful for any person * * * to use within the territory of the United States of America and its exterior possessions the emblem of the Greek red cross on

a white ground, or any sign or insignia made or colored in imitation thereof or of the words "Red Cross" or "Geneva Cross" or any combination of these words.'

"It would therefore seem that there is some presumption at least when one speaks of the Red Cross or of the Red Cross Society that the speaker, when not limiting and specifically pointing out the fact that he has in mind a different organization, such as the local chapters, he means the American National Red Cross. If it were the wish of the testator to bestow upon the Wakonda Branch of the Clay County Chapter of the Red Cross, it is quite natural that he would have used appropriate language to refer directly by name or some suitable way of designating the local chapter or organization. We feel that the learned trial court was fully justified under the evidence in so finding and that we are not warranted in disturbing his findings and conclusions as to the intention of the testator."

It has also been held by the appellate court of Indiana in American National Red Cross v. Felzner Post, Inc., 86 Ind.App. 709, 159 N.E. 771, under Burns Ann. St. 1926, Sec. 244, U.S. Statutes are part of law governing state, and appellate court takes judicial notice of them.

"Court takes judicial notice that American National Red Cross is corporation by Act Cong. Jan. 5, 1905 (36 U.S.C.A. § 1 et seq.), of its activities that is has authority to accept bequests for certain purposes, that it is required to organize subordinate agencies, and that county chapters thereof are its local agencies, through which it acts, and for which it is responsible. * * *

"Courts take judicial notice of regulations of governmental and quasi governmental agencies, and of provisions and charters of private corporations discharging public charitable functions."

The Territorial Court of Alaska also takes judicial notice of these matters under the law.

 It appears that the attorney for the American National Red Cross has used the name "American National Red Cross Society" in prosecuting the proceedings herein on behalf of the American National Red Cross. This I am advised was done through inadvertence or mistake, and permission is hereby given to amend the proceedings herein by substituting the name of "American National Red Cross" wherever "American National Red Cross Society" is used.

The court therefore holds that the document in question is the holographic will of Gustaf Lanart, deceased; that the testator was of sound mind, over twenty-one years of age and not acting under any fraud, duress or undue influence; that said will was and is entitled to probate as such; and that by its terms the testator has willed to the American National Red Cross his entire estate.

Findings and decree may be prepared accordingly.